May it please the Court, Attorney Vito Castagnoli of Milford, Connecticut, for Mr. McDade, if he will. Thank you, Your Honor. Mr. Durham, basically this matter in the memo comes back to a striking similarity to a decision that was made by this case in U.S. v. Brock. In fact, the appellant in that case who prevailed was an appellant named Dickerson. Initially the case came down in the middle of our trial last year of Mr. McDade. The issue is really an issue of what the difference between a buyer and seller relationship between an individual who buys narcotics from someone else who's allegedly the head of a conspiracy and being part of that conspiracy themselves. Isn't there all the difference between that case where there was essentially no evidence except the transaction and this one where you have Scott's journal, where you have your client being directly involved with a confidential agent? You have, yeah, in Brock Tuber was a longer relationship, but this one is even longer. Don't putting all those things together amount to enough for a jury to find that this was not just a buyer relationship but a membership in a conspiracy? We would submit that it's not, and if you look at every instance that the government alleged in their memo, every one of them would seem to indicate, I believe, that under the Brock indices that they lay out for whether or not a person's a conspirator or just a buyer and a seller, we should prevail. In Brock, there were five things that were mentioned that the Brock court felt were indices of a conspiratorial relationship, because again, it should be a conspiratorial relationship, where an individual effectively makes everyone else in the conspiracy an agent for him. That's the basis for not only the conspiracy charge, but for also bringing co-conspirator hearsay declarations, other actions by co-conspirators. The five indices were prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit, and quantity of drugs. In the- Why don't we here have a situation where at least the piece of evidence or the pieces of evidence that pertain to this March 3rd, 2014 transaction, where your client accompanies Scott to a meeting where they negotiate with another buyer, and it's your client who takes the drugs out of his pocket after a trip to his home and supplies them to the buyer. I mean, that suggests that he's involved with Scott in a distribution agreement. That's correct. But remember, in Brock, there's no issue. Dickerson was involved with Brock. There's no issue that Scott- We don't have to track another case. We have to find enough evidence to allow a jury to conclude that your client is not simply Mr. Scott's buyer. And I don't know how we can say that the jury couldn't conclude that when he's with Mr. Scott and helping him supply. Yes, your honor. However, Scott and McDade go to a certain place, a deal is conducted. By the way, everything on the tape is Mr. Scott speaking. Mr. McDade hands the cash to Mr. Scott. That was the allegation. That was what was proven, a cash transaction. I ask you, in a rhetorical question- What I'm talking about is where your client transfers crack from his pocket. I ask you, and this is a rhetorical question, does that evince a level of trust in Mr. McDade to be there with Mr. McDade and to get the cash right away? I would argue it shows that there's no trust between these two individuals. What you could argue to the jury is one thing, whether or not as a matter of law, the jury was precluded from finding trust is what I'm having difficulty with. Well, our argument, and it's been our argument all along, it was our argument before it was submitted to the jury, after it was submitted to jury in here, is that there wasn't enough here to get it to the jury. That was the decision in Brock, and we feel there's striking relationship between this case and the Brock matter. I could explain everything that was mentioned in the government's brief. Of course you can explain, because in fact, a jury could have come out the other way. And you have some evidence, the fact that he lived in an area which was not the same territory and that on which a jury could have come out your way, but isn't there enough evidence of behavior on the part of your client with respect to various people in this situation that speak not of buyer-seller, but of member of a group? And that's the question, is there enough evidence that a jury could find that? We would submit that there wasn't enough evidence. We would submit that he bought from several different individuals, different conspiracies, lived in a different area. This is evidence that was presented by the government. The seller to Mr. McDade was presented by the government. The map of the areas that they control, which my client's house was not on, was presented by the government. From the government's evidence, the evidence in front of the court at the time we made the motion for acquittal, we would submit there was not enough to submit it to the jury on the conspiracy charge. We also believe that because of the fact that there wasn't enough, that the Ganey ruling, and this is a case where my client was the only one who went to trial. It wasn't a situation where if the Ganey ruling went for us, there would have been a curative instruction. There should have been no evidence that was brought in before the court in terms of actions and third party conversations under the co-conspirator hearsay. Yeah, but that follows from the first, doesn't it? Correct, it does. Okay. And we believe that there was not evidence, it's pure and simple in that. And following the cases that this court's ruled on, Hawkins and then Parker and then Brock, we look at all the indices there that were set out in those decisions as to whether or not there was sufficient evidence, we don't believe that there was. Thank you very much. Good morning, Your Honor. John Durham for the United States. Let me first point out, with respect to Mr. Casagnoli's reference to the fact that the Brock decision came down in the middle of the trial, that's absolutely correct. And a reading of this record makes it very clear that the district court judge, Judge Meyer, paid particular attention to exactly what this court said in Brock. Indeed, when one reads the jury instruction that was given by Judge Meyer, it incorporates language directly out of Brock. And as Judge Calabrese has indicated, the jury made the decision based on that proper instruction that there was sufficient evidence. Your Honor makes reference to the March 3rd incident. In Brock, the evidence was, at least as reflected in that decision, was that Dickerson had no relationship at all to the organization. In fact, they say in the Brock decision that he had no contact with the organization other than when he was purchasing eight ball quantities of crack cocaine. Not from the head of the organization as suggested by counsel, but rather a person under that. Head of the organization in the Brock case is a fellow named Jackson. That is not who Dickerson was dealing with. So when you look to the facts of this case, the March 3rd incident is one which pretty much paints the entire picture here. Not only was McDade with Scott when the actual sale and distribution occurred. There is a precursor event where Scott went to meet with this new customer. This is supposed to be, they're going to distribute a sample of an ounce of crack cocaine in anticipation of a half a kilogram distribution of cocaine. And when Scott went to the initial meeting with the undercover, the cooperating individual, McDade was with him. McDade stayed in the truck outside the store where Scott initially met with the cooperating individual. Jurors could, and probably did, reasonably conclude from that that McDade was providing counter surveillance for Scott. They had the second meeting, as your Honor had indicated. First, McDade went to the house. He was there for a short period of time, and then the distribution occurred. It was McDade who had the drugs on his person. It was McDade who took the money from the cooperating individual in the case. And it's McDade who provided the funds in the cooperating individual's presence to Mr. Scott. That's something other than a buyer-seller relationship, as suggested by the defense and as argued unsuccessfully to the jury in this case. Separate and apart from those events, it's relevant, we would respectfully submit, that McDade was calling the head of the organization, Mr. Scott, on Mr. Scott's drug phone. He wasn't talking to some underling. He wasn't talking to some lieutenant. He was talking directly to the head of the organization, Mr. Scott. Beyond that, there was evidence presented in the record with respect to some of the factors set out in the court's prior cases, Rejos and others, that he, Mr. Scott, would extend credit or front drugs, in this instance, to Mr. McDade. There's evidences in the record, as your Honor reflected, or referred to, the journal. Unlike many of the other co-conspirators in this case, with respect to this particular defendant, when agents- I'm curious about the journal, and I just wonder, if that were the only evidence other than that, would you suggest that that is enough to suggest a conspiracy? That journal, I'm curious, or does a buyer-seller sometimes create enough affection that you help him out when he's in jail, or not? Well, it would be a closer question, for sure, but that may be enough in itself, because the journal alone, it didn't just include Mr. McDade, it included other persons who were indicted and pleaded guilty to being part of this conspiracy. There were at least three, perhaps four additional people who were in the journal that Scott, the head of the organization, said he would write to and he would send money to. So, in combination with the quantity of drugs, because McDade typically was getting quantities of 63 grams of crack cocaine at a time, which far exceeds what is a user quantity, it clearly understood in that context that it was a redistribution and that it was helpful to the organization to be moving that quantity of drugs on a regular basis. So, it might very well have been sufficient with the quantity of the sales. Separate and apart from those items, the record in this case also reflected the nature of the relationship as reflected in a rap video. The Judge Meyer was very careful about only admitting certain still photographs from a particular rap video. But as to this drug trafficking group, they reveled in what they were doing. And indeed, when they had a video recorded called Balls to Bricks, which is eight balls of crack cocaine to kilogram or more quantities of crack cocaine, there were certain persons who were front and center in that video, Mr. Scott being one of them. Another one prominently on display in the video is Mr. McDade. And there were several other members of this particular drug organization. Separate and apart from that, during the course of the electronic surveillance that was done in this case, there were intercepts made where Scott called and spoke with Mr. McDade because he, Scott, needed 17 grams of crack to make up for some bad crack that he had given to somebody else. And the two individuals, McDade and Scott, then arranged to get 17 grams of good crack cocaine to Scott so Scott could complete reimbursing one of his customers who happened to be a high schooler distributing crack cocaine in high school. And then he, Scott, at the end of the day, literally at the end of the day, reimbursed McDade for the 17 grams of crack that he had provided in connection with this particular ordeal. In substance then, unlike the case in Brock, where the only involvement between Dickerson and a lieutenant in that case, not the leader of the group, that was the only context of the sales, here there's months of intercepts involving these co-conspirators, including Mr. McDade, the evidence even included Mr. McDade, while he was incarcerated, calling his mother, talking about mutual trust, levels of mutual trust, having his mother go to Scott to get drugs for continued distribution. Or during the period of electronic surveillance, McDade calling Scott, talking about new customers, his mother's people, that they were going to get drugs for so they could distribute more crack cocaine in that fashion. In substance then, the evidence in this case is very far removed from those facts and the substantive evidence in the Brock case, which caused the panel of this court to say, in that instance, the conduct by Mr. Dickerson did not amount to co-conspirator. It only amounted to a buyer-seller relationship. Unless the court has questions concerning anything else raised in the briefs, the government will rest on that. Thank you. Thank you, Your Honor. Mr. Vignoli, you have reserved some time. Yes, there are three things that I would like to bring up to the court, and they're factual issues. One is the issue of extension of credit. And I think in the US versus Parker decision from this court, there was a thorough explanation of why credit is important and why it's such an important thing. A leader extends credit, the leader of a conspiracy extends credit. It's a tacit admission that the member he's extending credit to is selling to someone else and has been successful to doing that in the past so he could trust it. In this case here, these are the bits of evidence of my client buying drugs. He bought 63 grams from an individual the government's witness testified for cash at that point. He bought another 63 grams where the government's witness on cross-examination testified that he went out and got the cash immediately. There was one other instance brought up by the state, by the government in the argument, I'm sorry, which indicates that Mr. Scott indicated to Mr. McDade, you shorted me for $10, indicating a cash transaction. The only other transaction was one where he asked Mr. McDade to extend him credit. I would suggest to the court that the credit issue weighs very heavily in favor of the fact that this was a buyer-seller relationship. Because Mr. McDade on almost every occasion paid cash immediately or shortly thereafter and did not involve, that Mr. Scott did not give him credit. The second, quickly, are the journal and the rap video. The journal was a number of people that the argument was made that Mr. Scott helped while they were in jail. Number of people on that list were not part of the conspiracy. The rap video, I won't go too deeply into the rap video with the court, except to say that on cross-examination, the government's witness testified that many of the people in the rap video. There were two aspects of the rap video. One is a number of people on stage, and the other was a number of people who were at this club for New Year's Eve celebration. Most of the people there were not part of the conspiracy either. One question, the people in the journal who were not part of the conspiracy, were they buyers or sellers, or were they completely different third parties? I don't want to mislead the court. I don't remember what the relationship that Mr. Scott had with them was. I don't think it was explained at the time, and I don't know that I fleshed it out. Thank you. But the fact of the matter is, on every one of those instances, there were people who were not part of the conspiracy. Mr. McDade's mother was not charged as part of the conspiracy. It tends to show that there was a buyer-seller relationship between Mr. Scott and Mr. McDade. Thank you very much. Thank you. Council approved to take the case under advisement.